UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                           Case No. 04-CR-31

MARK RANUM,

        Defendant.

## MEMORANDUM

On January 14, 2005, two days after the Supreme Court decided United States v. Booker, I had occasion to sentence defendant Mark Ranum, a loan officer convicted of misapplying bank funds. In order to impose sentence on Ranum, I had to carefully consider Booker's directives to district courts. In this memorandum, I explain how I understand Booker and why I sentenced defendant Ranum to a year and a day in prison.

### I. PRINCIPLES OF SENTENCING POST-BOOKER

In Booker, the Supreme Court held that Blakely v. Washington applied to the federal sentencing guidelines, and that the Sixth Amendment's jury trial guarantee prevented judges from finding facts that exposed a defendant to increased prison time. As a remedy, a different majority of the Court excised the provision of the Sentencing Reform Act that made the guidelines mandatory, 18 U.S.C. § 3553(b). The remedial majority held that district courts must still consider the guideline range, 18 U.S.C. § 3553(a)(4) & (5), but must also consider the other directives set forth in § 3553(a). Thus,

under Booker, courts must treat the guidelines as just one of a number of sentencing factors.

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." Section 3553(a)(2) states that such purposes are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)  to afford adequate deterrence to criminal conduct;
> (C)  to protect the public from further crimes of the defendant; and
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (3) the kinds of sentences available; (6) the need to avoid unwanted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

The directives of Booker and § 3553(a) make clear that courts may no longer uncritically apply the guidelines and, as one court suggested, "only depart . . . in unusual cases for clearly identified and persuasive reasons." United States v. Wilson, Case No. 2:03-CR-0082, 2005 WL 78552, at *1 (D. Utah Jan. 13, 2005). The approach espoused in Wilson is inconsistent with the holdings of the merits majority in Booker, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in Booker, directing courts to consider all of the § 3353(a) factors, many of which the guidelines either reject or ignore. For example, under § 3553(a)(1) a sentencing court

2

must consider the "history and characteristics of the defendant." But under the guidelines, courts are generally forbidden to consider the defendant's age, U.S.S.G. § 5H1.1, his education and vocational skills, § 5H1.2, his mental and emotional condition, § 5H1.3, his physical condition including drug or alcohol dependence, § 5H1.4, his employment record, § 5H1.5, his family ties and responsibilities, § 5H1.6, his socio-economic status, § 5H1.10, his civic and military contributions, § 5H1.11, and his lack of guidance as a youth, § 5H1.12. The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the "history and characteristics" of the defendant. The only aspect of a defendant's history that the guidelines permit courts to consider is criminal history. Thus, in cases in which a defendant's history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the guideline range.

Further, § 3553(a)(2)(D) requires a sentencing court to evaluate the need to provide the defendant with education, training, treatment or medical care in the most effective manner. This directive might conflict with the guidelines, which in most cases offer only prison. See U.S.S.G. § 5C1.1 (describing limited circumstances in which court can impose sentence other than imprisonment). In some cases, a defendant's educational, treatment or medical needs may be better served by a sentence which permits the offender to remain in the community.

In addition, § 3553(a)(7) directs courts to consider "the need to provide restitution to any victims of the offense." In many cases, imposing a sentence of no or only a short period of imprisonment will best accomplish this goal by allowing the defendant to work

3

and pay back the victim. The guidelines do not account for this. In fact, the mandatory guideline regime forbid departures to facilitate restitution. United States v. Seacott, 15 F.3d 1380, 1388-89 (7th Cir. 1994).

Finally, in some cases the guidelines will clash with § 3553(a)'s primary directive: to "impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing.[1]

In sum, in every case, courts must now consider all of the § 3553(a) factors, not just the guidelines. And where the guidelines conflict with other factors set forth in § 3553(a), courts will have to resolve the conflicts.

Some have suggested that due to the Commission's expertise and experience developed over the years it is appropriate to afford their work "heavy weight." Wilson, 2005 WL 78552, at *1. I agree that courts must in all cases seriously consider the guidelines. The Commission has collected a great deal of data over the years and studied sentencing practices. Thus, courts not imposing sentences within the advisory guideline range should provide an explanation for their decision. But in so doing courts should not follow the old "departure" methodology. The guidelines are not binding, and courts need not justify a sentence outside of them by citing factors that take the case outside the "heartland." Rather, courts are free to disagree, in individual cases and in the

---

[1] Many judges have criticized the guidelines not only for their inflexibility, for also for their unnecessary harshness in many cases. See, e.g., Rhonda McMillion, "ABA Supports Push to Restore Judicial Discretion in Sentencing," 90 A.B.A.J. 62 (Jan. 2004) (noting speech by Justice Anthony M. Kennedy stating that "prison sentences are too long, mandatory minimum sentences should be repealed, and sentencing guidelines should be reconsidered"); Gina Holland, "Justice Applauds Bucking Sentencing Law," at http://news.findlaw.com (Mar. 17, 2004) (quoting Justice Kennedy's statement that courts should not have to "follow, blindly, these unjust guidelines").

4

exercise of discretion, with the actual range proposed by the guidelines, so long as that the ultimate sentence is reasonable and carefully supported by reasons tied to the § 3553(a) factors.

Sentencing will be harder now than it was a few months ago. District courts cannot just add up figures and pick a number within a narrow range. Rather, they must consider all of the applicable factors, listen carefully to defense and government counsel, and sentence the person before them as an individual. Booker is not as an invitation to do business as unusual.

In the present case, after carefully considering all of the evidence and applying all of the § 3553(a) factors, I declined to follow the guidelines and instead imposed a sentence which was sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

## II. APPLICATION OF PRINCIPLES

Defendant Ranum held the position of senior loan officer at State Financial Bank. His duties included managing a commercial loan portfolio and evaluating loan applications. He was able to make secured loans of up to $300,000 on his own authority, but had to obtain the approval of the bank's credit committee for loans over that amount. He also had to report to the committee any loan he made in excess of $150,000.

In April of 2000, Barry Craig and Ralph Diehl approached defendant seeking to obtain financing for a business that would operate a cruise ship on the Great Lakes. Craig and Diehl had arranged to lease a ship from a Greek shipping company, Attica, and needed a letter of credit and other funds to start the business and take possession of the

5

ship. After reviewing their business plan and obtaining their personal guarantees and those of several of their relatives, as well as a guarantee from the business – "Great Lakes Cruises" ("GLC") – defendant agreed to extend credit. He had no prior relationship with Craig or Diehl.

On April 5, 2000, defendant issued a "standby letter of credit"[2] in the amount of $190,000. Subsequently, he twice increased the amount of the letter by $190,000, making the bank's total obligation $570,000. The purpose of the letter was to ensure that GLC fulfilled its obligations to Attica under the lease agreement. Defendant did not report issuing the letter of credit to the credit committee or obtain its approval. On October 25, 2000, defendant loaned GLC $100,000 to cover a cash payment that it owed to Attica. He did not report or obtain approval for this loan although in aggregation with the letter of credit he had exceeded his lending authority to GLC. On November 17, 2000, defendant issued a second letter of credit, this time in the amount of $340,000, which in January 2001 he increased to $580,000. This letter, coupled with the previous $100,000 payment, was needed to enable GLC to take possession of the ship. Again, defendant did not report or obtain approval for the letter. Finally, on March 9, 2001, defendant loaned GLC $154,000 to make necessary modifications on the ship and again did not report the loan.

Early on, GLC appeared to have a promising future, receiving reserve bookings worth about $3,000,000. On April 21, 2001, GLC repaid the October 2000 loan of

---

[2] A standby letter of credit guarantees payment to a third party concerned about the credit worthiness of the party with whom it is doing business. Unless the borrower defaults on its obligations to the third party, the creditor bank does not actually disburse funds.

$100,000. However, when the time came for GLC to bring the ship from Greece to the Great Lakes, GLC did not have the $580,000 needed to take possession. Rather than have Attica draw on the second letter of credit, defendant authorized a loan to GLC of $580,000. Prior to doing so, he approached the credit committee and advised it that the loan was "cash collateralized" and thus "risk free." Although defendant hoped and expected that GLC would have sufficient cash reserves to collateralize the loan, it did not, in fact, have such reserves at the time. Thus, his statement to the committee was false. Based on defendant's statement, the committee approved the loan, and in May 2001, defendant wired the funds to Greece. On June 1, 2001, the second letter of credit (in the amount of $580,000) expired.

GLC began offering cruises in June 2001. However, it began experiencing cash flow problems and found it could not make the $300,000 lease payment due. Rather than permitting Attica to draw on the first letter of credit, defendant agreed to authorize a loan of $300,000 to Craig personally to cover the payment. Defendant immediately wired the money to Greece. Considered in isolation, defendant had the authority to make this loan. However, because he made the loan to an individual who had personally guaranteed GLC's obligations, the loan did not comply with bank policy.

GLC's chance to be successful ended soon after its ship began to cruise the Great Lakes. On or about June 24, 2001, the Centers for Disease Control ("CDC") boarded the ship, found it unfit and issued a no-sail order.[3] The order generated substantial adverse publicity and as a result many persons who had reserved bookings cancelled them. GLC

---

[3]The CDC issued the order because of Attica's failure to properly prepare the ship, not because of any failing on GLC's part.

7

was forced to cancel its planned cruises for the remainder of the cruise season, and its business failed. Aside from the $100,000 loan that GLC repaid in April 2000, the bank lost all of the money defendant loaned to GLC and Craig.[4] Its total loss was $1,134,000.[5]

With the business collapsing and the bank's funds in jeopardy, defendant retained the law firm of Kirkland and Ellis to try to protect the bank. Initially, he did not advise the bank that he had retained Kirkland and Ellis or how much credit he had extended to GLC and Craig. At the prodding of the firm, defendant eventually disclosed what he had done. In August 2001, the bank fired defendant.

In February 2004, the government charged defendant in a three count indictment. Count one charged him with misapplication of bank funds by a bank officer pertaining to the $580,000 loan, count two charged him with making a false statement in connection with a loan application (his statement to the credit committee concerning the same loan), and count three charged him with misapplication of bank funds pertaining to the $300,000 loan to Craig. Defendant went to trial, at which he admitted exceeding his loan authority and misleading his employer but denied that he intended to harm or defraud the bank. The jury convicted him on all three counts.[6]

---

[4] It appears that Attica later made a claim on the first letter of credit, which the bank paid $100,000 to resolve.

[5] This figure is based on adding the $580,000 loan, the $300,000 loan, the $154,000 loan, and the $100,000 paid out on the first letter of credit.

[6] Under counts one and three, the government was required to prove: (1) that defendant was an officer or employee of the bank; (2) that the bank was federally insured; (3) that defendant used his position to wilfully misapply funds; (4) that he did so with intent to injure or defraud the bank; and (5) that he wilfully misapplied funds in excess of $1000. Federal Criminal Jury Instructions of the Seventh Circuit 208 (1999). Regarding the fourth element, the applicable jury instruction stated: "A bank officer or employee acts with the intent to injure or defraud a bank when he uses his relationship

8

Prior to defendant's trial, the Supreme Court issued its decision in Blakely, casting serious doubt on the status of the guidelines. However, the government did not seek jury findings as to any sentencing enhancements under the guidelines. Thus, defendant argued that he could not constitutionally be sentenced under the guidelines. Two days before sentencing, the Court decided Booker. Based on Booker, I determined the guideline range in the usual manner and then considered the range along with the other factors set forth in § 3553(a).

I determined that the applicable offense level was 21 (base level 6, U.S.S.G. § 2F1.1(a) (2000), plus 11 for amount of loss, § 2F1.1(b)(1)(L), plus 2 for more than minimal planning, § 2F1.1(b)(2)(A), plus 2 for abuse of a position of trust, § 3B1.3)[7] and the criminal history category was I, creating an imprisonment range of 37-46 months.[8]

---

with or position in the bank for his own or another's personal advantage, or when he acts with the intent to injure the bank's interests or with reckless disregard for the interests of the bank." Id. at 210. Based on the evidence and the jury's questions during deliberations, it is likely that the jury found that defendant acted with reckless disregard.

[7] I determined defendant's offense level under the 2000 version of the guidelines because it produced a lower range than the 2004 version. See U.S.S.G. § 1B1.11(b)(1) (stating that courts should use the version of the guidelines in effect at the time of sentencing unless doing so would violate the Ex Post Facto Clause). Even though the guidelines are no longer mandatory, making it unclear whether the Ex Post Facto Clause applies, because the Booker Court did not instruct district judges to apply the guidelines any differently than they previously did in determining the advisory guideline range, I applied § 1B1.11(b)(1) and all other applicable provisions.

[8] I resolved the factual disputes regarding the guidelines on the record as I did before Blakely/Booker. A court cannot reasonably consider the guideline range until it properly determines what that range is. Further, a court might unreasonably exercise its discretion if were it to apply the guidelines but calculate them incorrectly. Cf. United States v. Ferron, 357 F.3d 722, 724 (7th Cir. 2004) ("[A] misapplication of the guidelines is an error of law and is by its very terms, an abuse of discretion."); Maynard v. Nygren, 332 F.3d 462, 467 (7th Cir. 2003) (stating that "a district court by definition abuses its discretion when it makes an error of law").

9

The government argued that I should impose a sentence consistent with that range. The defense argued for a period of home confinement. I rejected both recommendations and imposed a sentence of one year and a day.

I determined that the factors set forth in § 3553(a) fell into three general categories: the nature of the offense, the history and character of the defendant, and the needs of the public and the victims of the offense. I analyzed each category and in so doing considered the specific statutory factors under § 3553(a), including the advisory guidelines.

First, I considered the nature of the offense. The offense was serious for several reasons, the primary one being the amount of the loss. In addition, defendant made repeated loans outside of his authority over an extended period of time, abusing his employer's trust. When things started to go badly, defendant was not honest with his employer, recklessly loaned GLC more money and attempted to conceal what he had done.

However, defendant's culpability was mitigated in that he did not act for personal gain or for improper personal gain of another. Under § 3553(a) and the decisions of the Supreme Court, a sentencing court may properly consider a defendant's motive. Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993) (stating that "the defendant's motive for committing the offense is one important factor"). In the present case, defendant did not know Craig and Diehl before he lent them money, and he had no personal stake in making the loans. Nor did he intend to harm the bank. On the contrary, he wanted GLC to succeed so that it could repay the loans. When the loans went bad, defendant made

10

attempts to protect the bank. Further, it was by no means a foregone conclusion that GLC would fail. If the ship that GLC leased from Attica had met appropriate standards, GLC might well have been able to repay the loans in full. The evidence presented at trial showed that GLC's venture was a promising one and generated substantial early bookings. GLC failed primarily because of the inadaquacy of the ship it obtained from Attica. Thus, although the offense was a serious one, I found some of the circumstances surrounding it to be unusual.

Defendant's offense level under the advisory guidelines was largely the product of the loss amount. One of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level. For example, the guidelines treat a person who steals $100,000 to finance a lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child.[9] It is true that, as the government argued in the present case, from the victim's perspective the loss is the same no matter why it occurred. But from the standpoint of personal culpability, there is a significant difference. See United States v. Emmenegger, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) ("Were less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of different frauds."). In the present case, defendant did not act for personal gain. He made loans outside his authority and was reckless with his employer's money. But that is not the same as stealing it. Thus, due to the nature of the

---

[9]Further, some courts of appeals prohibited downward departures on the basis of the defendant's not acting for personal gain. See United States v. Corry, 206 F.3d 748, 750-51 (7th Cir. 2000).

11

case, I found the guideline range, which depended so heavily on the loss amount, greater than necessary.

I then considered the second general category – the history and character of defendant. The factors in this category weighed heavily in defendant's favor. He is fifty years old, had no prior record, a solid employment history, and is a devoted family man. He has two children, one of whom is still in school. Prior to his recent marriage, he was a single father who did an excellent job of raising two daughters. He also provides care and support for his elderly parents. His father suffers from Alzheimer's disease and is particularly dependent on defendant – defendant is one of the few people he still recognizes. Defendant's mother is also elderly and suffers from depression. I concluded that defendant's absence would have a profoundly adverse impact on both his children and his parents. Defendant himself suffers from serious health problems, including diabetes and sleep apnea.[10]

In addition, numerous friends and business associates wrote letters attesting to defendant's good character. Of particular interest were letters from defendant's former boss and a former co-worker from State Financial Bank. Both spoke highly of defendant.

I also noted that defendant's conviction had significant collateral effects on him. After his termination by State Financial Bank, defendant obtained a good job at Anchor Bank. As a result of the conviction he lost that job and will be unable to work in banking again.

---

[10]Defendant's physician advised me that in his view imprisonment would further adversely affect defendant's health. However, I did not believe that defendant's health problems were so severe that the Bureau of Prisons could not handle them.

12

Under all of the circumstances, I concluded that defendant is not a danger to society and is highly unlikely to reoffend.

Finally, I considered the needs of the public and the victim. Because the case was so unusual, I doubted whether a prison sentence would have much value as a deterrent. Loan officers will generally follow bank rules because their jobs depend on it. As previously stated, I also concluded that the public did not need to be protected from defendant. As for the victim, the bank, defendant's ability to make restitution would be enhanced if he was not incarcerated for an overly long time.

Nevertheless, in order to promote respect for the law and in recognition of the significant loss to the bank, I concluded that defendant had to be confined for a significant period of time. However, I concluded that the sentence called for by the guidelines, 37-46 months, was much greater than necessary to satisfy the purposes of sentencing set forth in § 3553(a). The range does not properly account for defendant's absence of interest in personal gain, for the fact that GLC could easily have succeeded, for defendant's otherwise outstanding character and for the significant benefits to family members resulting from his presence. Instead, I imposed a sentence of twelve months and one day, followed by five years of supervised release. This sentence was sufficient to promote respect for the law and account for defendant's serious abuse of trust over an extended period of time.[11]

Dated at Milwaukee, Wisconsin, this _____ day of January, 2005.

---

[11] I note that defendant would likely have received a lower sentence had the remedial dissenters in Booker carried the day. The jury made no findings on any guideline enhancements. Thus, defendant's guideline sentence would have been capped at the base offense level.

_____
LYNN ADELMAN
District Judge